# PERLEY R. LOVEJOY *vs.* EDWARD IRELAN.

From a *joint* decree against *several*, one defendant *alone* cannot appeal, without summons and severance, and his appeal so taken will, on motion, be dismissed.

To a bill to vacate a deed as fraudulent as against the creditors of the grantee, the grantor is a necessary party, as well on account of the fraud charged, as because of the title remaining in him for the benefit of creditors.

General rules framed to protect the rights of suitors, and to promote regularity of judicial proceedings, should not be dispensed with to meet the exigencies of special cases.

APPEAL from the Circuit Court for Baltimore city.

In this case, a bill was filed on the 22nd of February 1856, by the appellee against the appellant and one Harlow W. Heath, to vacate and set aside a bill of sale from the said Heath to Lovejoy, as fraudulent as against the creditors of the grantor. Upon bill, answers and proof, the court below (KREBS, J.) passed a decree vacating the bill of sale, and against both defendants for costs. From this decree Lovejoy alone appealed, and the appellee moved to dismiss the appeal.

This motion was argued in connection with the merits, at the December term 1859 of this court, before ECCLESTON, TUCK and BARTOL, J.

*Benj. C. Barroll,* for the motion:

One party alone cannot appeal from a *joint* decree or judgment against several, without summons and severance. 2 *Overt.,* 189. 2 *J. J. Marshall,* 72, *Young vs. Ditto.* 3 *How., (Miss. Rep.,)* 43, *Green vs. Planters Bank.* 5 *How., (Miss. Rep.,)* 12, *Duvall vs. Cox.* 11 *Wheat.,* 414, *Williams vs. Bank of U. S.* 7 *Pet.,* 399, *Owings vs. Kincannon.* 12 *Pet.,* 140, *Wilson's heirs vs. Ins. Co.* 16 *Pet.,* 521, *Todd vs. Daniel.* 4 *Md. Rep.,* 517, *Price & Martin, vs. Thomas & George.* 5 *Md. Rep.,* 477, *Alexander vs. Worthington.*

*Henry Stockbridge*, against the motion:

The Act of 1814, ch. 94, sec. 5, provides, "that *all* and *every* person or persons" who shall or may think *themselves aggrieved* by *any* decree of an equity court, "shall be at liberty in *all* cases to appeal." No Maryland case can be found in which it has been held that one of several defendants may not appeal, and there are numerous cases in which such appeals have been taken and sustained without question. Most of the cases cited on the other side are *cases at law* and not in equity, where the practice of summons and severance has never, even in England, been held to apply. Besides, in this case Heath was examined as a witness, and applied for the benefit of the insolvent laws, and was duly discharged thereunder prior to the appeal, and had, therefore, no interest whatever in the decree.

TUCK, J., delivered the opinion of this court.

Upon the pleadings and proofs in this cause, a decree was passed vacating a deed from *Heath* to *Lovejoy*, on the ground of fraud as against the creditors of the grantor, and giving costs against both defendants. Lovejoy only has appealed, and the appellee having moved to dismiss the appeal on account of the non-joinder of the other defendant, our duty is to inquire whether the appeal lies.

It has always been the practice in this State, to make the grantor a defendant to bills of this kind, and we consider the law to be well settled that he is a necessary party, as well on account of the fraud charged, (*Calvert on Parties*, 19, 20, 24, 264,) as because of the title remaining in him for the benefit of creditors. *Waters vs. Dashiell*, 1 *Md. Rep.*, 470. This being so, the decree in this case must be treated as joint against both defendants, not only as to costs, but also as to the relief granted.

We have not been referred to any case in Maryland where the point under consideration has been decided, but there is no doubt that, in cases at common law, a writ of error brought by one of several defendants, could not be maintained. *Tidd's Prac.*, 1189, 1226. The same has been

Lovejoy *vs.* Irelan.

held in this country.  *Duvall vs. Cox*, 5 *How.*, ( *Miss. Rep.*,)
12.  3 *Ibid.*, 43, *Green vs. Planters Bank.*  *Young vs.
Ditto*, 2 *J. J. Marshall*, 72.  The question has been before
the Supreme Court of the United States several times, and
uniformly disposed of by disallowing the appeal, without
reference to the character of the case, whether at law or in
equity.  In *Owings vs. Kincannon*, 7 *Pet.*, 399—a case in
equity—Chief Justice Marshall, delivering the opinion of the
court, said: "Upon principle, it would seem reasonable that
the whole cause ought to be brought before the court, and
that all the parties who are united in interest ought to unite
in the appeal."  He also adverted to the general usage of
chancery, to make one final decree, binding on all parties
united in interest.  See, also, *Deneale vs. Archer*, 8 *Pet.*, 526.
These cases were afterwards ( *Wilson's heirs vs. Ins. Co.*, 12
*Pet.*, 140,) referred to by Chief Justice Taney, and the same
principle applied.

The considerations on which this practice is followed else-
where, apply in our courts, and ought to have the same effect.
Inconvenience may sometimes result to parties in the particu-
lar instance, but general rules framed to protect the rights of
suitors, and to promote regularity of judicial proceedings,
should not be dispensed with to meet the exigencies of special
cases.  The law indicates a mode, by summons and sever-
ance, for one party to compel his co-defendant to join in the
appeal, or place himself in a position to proceed in his own
behalf.  *Tidd's Prac.*, 1189.

It is proper to observe that a similar point was ruled at this
term, against the motion to dismiss in the case of *Easter, et
al., vs. Travers, et al.*, but on the ground that the order
appealed from was not joint as against the parties; the court
expressly stating that in a proper case such a motion might
prevail.

Without expressing any opinion as to the merits of the
case, we think the appeal should be dismissed, with costs.

( Decided July 19th, 1860.)          *Appeal dismissed.*

*Note by the Reporter.*—In the case of *Easter, et al., vs. Travers, et al.*, above
referred to, no opinion was filed by the court, the appeal having been dis-

missed by order of the appellants, after the motion to dismiss had been decided in their favor, and it has not, therefore, been reported. In the argument upon the motion in that case, the same authorities were cited in support of the motion as by the appellee in this case.

At the same term at which the case was decided, the appellant applied for a re-hearing on the motion to dismiss, which was granted, and the same was re-argued before Le Grand, C. J., Tuck and Bartol, J.

*Henry Stockbridge,* against the motion:

The question presented by this motion does not appear to have been, at any time heretofore, formally and specifically urged as a ground for the dismissal of an appeal in Maryland, except in the case of *Price vs. Thomas,* 4 *Md. Rep.,* 515, which was a case at law, and where the objection was so obviated before decision, that this court did not decide upon the point. The fact that, in the whole judicial history of our State, no appellant has ever been refused his appeal upon this ground, while so many cases must have been before the court in which the point, if a sound one, might have been made, argues strongly that the motion now under consideration is based neither on law nor sound reason. The importance of the question which it raises cannot be over-estimated. To deny to one defendant the right to appeal, unless all of his co-defendants will concur and join to pray and to prosecute the appeal, is to place every man at the mercy of a reckless plaintiff and a corrupt co-defendant, and gives the inferior court a power which this appellant believes was never conferred by the Constitution or laws of the State.

The facts of the case now to be decided, (so far as it is necessary to state them, for a correct decision of the question,) as shown by the record, are as follows: On the 9th of February 1856, Heath executed, for the consideration of $750, to Lovejoy a bill of sale of certain goods, chattels, &c., therein specified and named. On the 22nd of February 1856, the appellee, Irelan, filed in the circuit court of Baltimore city his bill of complaint, alleging that said bill of sale was fraudulent, and made for the purpose of hindering, delaying and

Lovejoy *vs.* Irelan.

defrauding said appellee, as creditor of said Heath; praying that said bill of sale might be set aside as fraudulent and void; that the said Heath might be required to discover, upon oath, certain matters to him propounded, and that said Heath and Lovejoy might answer the premises upon oath. On the 19th of March 1856, Heath, in person, upon oath, filed his answer to the bill, utterly denying the alleged fraudulent intent, and declaring the whole transaction *bona fide*. On the 17th of May 1856, Lovejoy, by his counsel, filed his answer to the bill, duly sworn to, denying all the charges of collusion and fraudulent intent, and averring that it was *bona fide* in every respect. On the 27th of June 1856, the complainant, Irelan, applied to the court, by petition, for an order allowing him to examine the defendants, Heath and Lovejoy, as witnesses in the cause, to sustain the allegations of the bill, and the court the same day passed the order as prayed. On the 11th and 25th of February 1857, Heath was examined as a witness in the cause by the complainant, under the authority of such order; Lovejoy was never called to the stand, nor examined by him. On the 16th of May 1857, Heath *applied for the benefit of the insolvent laws, and was duly discharged thereunder*. On the 9th of April 1858, the complainant, by his counsel, filed a paper procured from and signed by Heath, in which, in consequence of his discharge under the insolvent laws, he withdraws all objections to his examination as a witness in said cause. On the 3rd of June 1858, the court filed a decree in the cause, annulling and setting aside said bill of sale, as fraudulent and void. And on the 25th of June 1858, Lovejoy appealed.

This was, in fact, rather an action *in rem.* than *in personam.* Its real purpose was to enable the complainant to reach, by execution, the chattels covered by the bill of sale, by setting aside the interest or property of the appellant, Lovejoy, therein. It sought to recover nothing from Heath, save these chattels; it claimed only those chattels from Lovejoy, and sounded in damages against neither beyond. As between Heath and Lovejoy, the ownership of these chattels could not be questioned. Whatever it might be to the rest of the world, as

67    v.17

between them the bill of sale was legally valid, and the ownership of the property was absolutely transferred by it. The sole aim, then, being to apply to the payment of Heath's debt to Irelan property which, as between Heath and Lovejoy, was absolutely Lovejoy's, Heath never had any real pecuniary interest in the proceeding; was merely a nominal party joined, that any contingent interest therein might enure to the benefit of his creditors. There was a complete and absolute severance of the interest of Lovejoy from that of Heath, *ab initio*.

The motion is based upon a total misapprehension of the English doctrine of the writ of error, to which an appeal under our statute bears some analogy. That rule, in cases of writs of error correctly stated, is that all parties who are joined in a cause *with a common interest*, and who are *jointly aggrieved by the judgment rendered*, shall join in suing out the writ and assigning errors, or that by some process there shall be a severance, so that part may proceed without the privity or concurrence of the others. And the reason of this rule (without an understanding of which we shall be liable to mistake the rule itself) is, that as there is no limit to the time of suing out the writ of error, unless all joined or were placed in the position upon the record of being unable to sue out the writ afterwards, the party who had recovered judgment might be vexed with successive writs of error *ad infinitum*, and obtain no advantage from the judgment recovered It was never the law, that all parties upon the record must join in the writ of error, regardless of the effect of the judgment upon themselves. Any one or more aggrieved by the judgment, is entitled to the benefit of the writ, as wholly independent of the action of his co-defendants, *who are not aggrieved*, as if they had no existence. None are compelled, nay, none are permitted to join in assigning errors, unless they are prejudiced by the judgment. This has been the uniform current of the English decisions from the days of the earliest reported cases to the present, without an exception. In *Cannon vs. Abbot*, 1 *Levinz*, 210, suit for trespass was brought against three, judgment by default obtained against

Lovejoy *vs.* Irelan.

two, and, on trial, verdict in favor of the third. It was held that the two only could bring the writ of error, and the third must not join, because "the judgment is not to his damage." So in *Hobart,* 70, *Parker vs. Sir John Lawrence and Nevil & Wood,* a like action against three, judgment against one, *nolle prosequi* entered as to two. The court disallowed a writ of error brought by all the defendants, and say, "Nevil and Wood should not have joined in this writ of error, for there was no judgment against them, nor they grieved. *The writ of error is ad grave damnum.*" In *Lady Cass vs. Tittle,* 2 *Strange,* 683, two of thirteen defendants brought writ of error, and it was held on all sides that "the writ can be brought by these two, *ad grave damnum* of themselves." In the *Swordblade Co. vs. Dempsey,* 2 *Strange,* 892, the court ordered the writ of error amended, because Mary Edwards had joined in it while the verdict was "really no way to her damage." So in *Rex vs. Inhabitants of All Saints, Ibid.,* 1110, the writ was quashed, because some joined in it who "did not suffer *grave damnum* by the judgment. The same doctrine controls the cases in *Cowp.,* 425; 2 *Bl. Rep.,* 1067; 2 *Ld. Raymond,* 870. And in view of all the cases, Tidd (2 *Tidd's Pr.,* 1135, 1136) lays down the practice as fixed and uniform, that "on a judgment against several parties, the writ of error must be brought in all their names, *provided they are all living* and *aggrieved by the judgment.*" And he reiterates correctly the reason of this rule of practice. See, also, 3 *Bac. Abr.,* 330, 335.

In this country the rule has never been made broader than in England, and courts (unless controlled by some Legislative Act) have never compelled parties to unite in prosecuting a writ of error, unless they were united in interest. In *Porter vs. Rummery,* 10 *Mass.,* 70, the court say: "Because, among those who become privies by interest in a judgment, or in the property affected by it, and therefore entitled to a writ of error, there may be several and distinct interests, so the remedy for their respective rights may be several and concurrent. Where this happens, each privy to the judgment is distinctly entitled to a writ of error, and *to maintain it by himself;* and this,

notwithstanding a release by any other having a like interest in the same judgment, by *a distinct interest*. The doctrine is the same in *Shirley vs. Lunenburgh*, 11 *Mass.*, 384, and in both these cases, as also in *Whiting vs. Cochran*, 9 *Mass.*, 532, the court go a step further, and add, that the "plaintiff cannot complain of non-joinder unless injured by it." In every case cited by the appellee, which has any relevancy whatever, and in every one that can be found in the books, the same fact exists, and the error of the appellee springs from his overlooking the fact that the several parties who were held bound to unite in the writ of error, were *united in interest*, and the failure to unite in bringing the writ, diminished the plaintiff's security. Thus, in 2 *Overt*, 189, the judgment was against joint obligors on a bond; in 2 *J. J. Marshall*, 72, it was a judgment for money for which all were liable; in 5 *How.*, 12, the order *"affected the rights* of the appellants, *and also of James Catling;"* and the case of *Owings vs. Kincannon*, 7 *Pet.*, 399, upon which so much stress is laid, has no force whatever as an equity precedent, and forms no exception to the rule as above stated. A bill was filed against many parties; it was afterwards dismissed as to some, abated as to others, and a decree made against six, who were *all united* in interest; two appealed. Chief Justice Marshall, in giving the decision of the court, with that candor which never failed him, said, that he finds "no precedent in chancery proceedings for the government of the court in this case." The court is therefore driven back upon the Act of Congress (1803, ch. 40) which authorized the appeal, and which says expressly that the appeal "shall be subject to the same rules, regulations and restrictions as are prescribed by law in cases of writs of error." It is, then, no equity decision, and constitutes no precedent for any chancery proceeding. As a decision of the Supreme Court of the United States in cases of writs of error, it goes no further than all the other cases go; to the extent, namely, of saying that all who are united in interest, jointly aggrieved by a judgment, should unite in bringing the writ of error.

But is there any unity of interest between this appellant

and his co-defendant, Heath? Heath was grantor, Lovejoy grantee in the bill of sale. Heath had parted with all his interest in the property sought to be affected by this proceeding, and had received his pay for it. Lovejoy had paid full value for it, and became sole owner. It was a matter of perfect indifference to Heath what became of it, or if he had any interest, his interest was that this proceeding should succeed, and the property, which he had once already been paid for, should then be appropriated to the payment of his indebtedness to this complainant. To Lovejoy, it was all-important that his business should not be broken up, his property taken to pay the debts of Heath, and himself remitted to the desperate chance of his remedies over against Heath. This total severance and even opposition in interest, is recognized by the terms of the bill of complaint. The two defendants then severed in their answers, and Heath for himself, and Lovejoy by his counsel, answered the several matters to them respectively propounded. To make the severance yet more complete, the complainant proceeded to change the position of Heath from that of defendant to that of witness. He obtained the special order, made him his witness, and relied upon his testimony. If any principle is established in law, it is, that where a complainant makes one of several defendants his witness, he can obtain, he can seek, no decree against that defendant. This very familiar principle could not have been so far overlooked by the judge below that he would have passed a decree against the witness, Heath, if he had any real interest in the subject-matter. From the moment that the complainant made Heath his witness, a decree against Heath became impossible, and Lovejoy being the only person on record against whom a decree could be passed, he became entitled, even if not so before, under the common law rule, to prosecute a writ of error alone. But this is not all. He applied for and obtained the benefit of the insolvent laws, and thereby was discharged from all liability to the complainant, and transferred to his trustee all property and interest, all claim and demand in and to every matter and thing in the wide world. Death could not have severed his

connection with the case more perfectly. After that, there could be no occasion for any legal process of severance, whether by summons or otherwise; and so, doubtless, thought the counsel of the appellee, when he obtained from Heath his formal withdrawal of all objection to his examination as a witness, and filed it in the cause. If Lovejoy's right to proceed alone in any measure he saw fit to pursue, could ever have been called in question, it could be so no longer. At common law, and under the English rule, he had the same right to the writ of error alone, that he would have had if Heath had been in his grave.

And yet this is not a writ of error, nor does it rest on any common law right. This is an *appeal in equity, under Act of Assembly.* However desirable it may be to give uniformity to "general rules framed to protect the rights of suitors, and to promote regularity of judicial proceedings," it is not competent for a court to establish one rule of practice, when the Legislature has prescribed a different one. Our General Assembly first struck away from chancery proceedings the foundation—the reason—on which the English rule of writs of error rests, and appointing an appeal as the remedy for error in the courts below, provided that all appeals in equity should be taken within nine months from the making of the decree appealed from, *and not afterwards.*—1785, ch. 72. This Act was a perfect remedy of the inconvenience designed to be avoided by the English courts, in adopting the rule of joinder in writs of error, and shows a clear legislative intent to abrogate the rule itself, so far as equity proceedings in Maryland were concerned. But that there may be no possible mistake, they go further, and by Act of 1814, ch. 94, expressly grant an appeal in equity to *"all and every person or persons who shall or may think themselves aggrieved by the decree."* The right of appeal is not granted to the *parties* to the cause as parties complainant and defendant; it is granted to *persons* as persons aggrieved, and the terms of the Act grant it to the aggrieved persons severally as well as jointly. It is *"all* and *every person* or *persons* who may appeal." And this leaves but one open question in the present cause,

viz., is this appellant *a person* who *thinks himself aggrieved?* a point too plain for serious argument.

Besides, if this appellant could be wrong in all these positions, the motion should not prevail to deprive him of all redress, when every other avenue has been closed by lapse of time. The appeal was taken at once, on the passing of the erroneous decree. The motion to dismiss was not made till a year beyond the nine months allowed for appeal had passed; till Heath was forever barred from appeal, (if he ever had the right,) and till Lovejoy was barred from bringing another appeal, (in place of this which it is proposed to dismiss,) in which he might interpolate an ancillary process of severance. But the policy of the law in Maryland has always been, in all equity proceedings, to do full justice as between the parties, "to bring the merits of the case in controversy fairly to trial;" to deny justice to no one on a naked technicality. To this end the broadest latitude of amendment is allowed, (1 *Code*, 73,) and this court is prohibited from a simple affirmance or reversal of a decree, when the substantial merits of a cause will not be determined by such affirmance or reversal, but may be by further proceedings. 1 *Code*, *Art.* 5, *sec.* 28. In this case a dismissal of the appeal *is* a denial of justice— a final disposition of the case without any decision upon the merits of the controversy; and if the court are of the opinion that this appellant has no right of appeal under the Act of 1814, and is not severed in interest from Heath, sufficiently to maintain his writ of error without Heath's concurrence, he maintains that the proceeding for effecting the severance should be taken under the present appeal, without a dismissal, which shall forever deprive him of all redress in the premises.

*Levin Gale,* on the same side:

The facts important to be considered upon the motion now before the court, are as follows: The appellee filed a bill against Heath and Lovejoy, to set aside a bill of sale of certain chattels made by Heath to Lovejoy—to this bill Heath and Lovejoy *each filed separate answers*—certain testimony

was taken, and an order was obtained by the appellee to have *Heath, one of the defendants, examined as a witness, and he was accordingly examined.* Among other things, it appears that Heath, subsequently to the filing of this bill, applied for the benefit of the insolvent laws. After sundry proceedings, the circuit court of Baltimore city passed a decree setting aside the bill of sale made by Heath to Lovejoy. From this decree Lovejoy appealed, and the motion made now is to dismiss the appeal, because it does not appear that Heath, the other defendant, has joined in the appeal. Can one defendant, under such circumstances, appeal without the consent or active participation of a co-defendant, whose interests are not similar? And, if he can, what steps are necessary to entitle him to take the appeal?

Much confusion has arisen in Maryland, from the fact that in practice we have *appeals* from the ordinary courts of common law, instead of *writs of error*. The only mode of correcting the erroneous judgments of a court of general jurisdiction, in matters pertaining to the common law, was by a writ of error either to the court itself, by writ of error *coram nobis*, or by a writ of error to transfer the cause to a superior or appellate court. An *appeal* as such from the Court of King's Bench to the Court of Exchequer Chamber, or to the House of Lords, is unknown. The only mode known is by writ of error. On the contrary, in matters of chancery, the reverse is the practice; a writ of error to the court of chancery, in matters pertaining to its equitable jurisdiction, is just as much unknown as an appeal is in the courts of common law. 3 *Bl. Com.,* 454, 406. This arose out of the different course of procedure in the practice of the courts of common law and those of equity jurisdiction. In all courts of common law, the commencement of all proceedings is by writ. In courts of equity, the proceedings are commenced by petition. In the common law practice, frequent difficulties occurred, growing in part out of the fact that the original writs were issued out of the court of chancery, (not in its equitable character however,) so that the court before whom it was returnable could not correct the writ. Indeed, down to the

Lovejoy *vs.* Irelan.

organization of the present Court of Appeals in our State, it was held that no amendment could be made of the *original writ*, although an Act allowed the amendment *of all* proceedings. A writ of error was an original writ, and great strictness was required in making it conform to the judgment it was intended to correct. The slightest mistake in the name of the parties, or in the recital of the judgment, was formerly held to be fatal, and the writ was quashed or dismissed, and proceedings had to be taken over again. The writ of error being an original writ, and in the nature of a new action, as much so as a *scire facias* on an old judgment, it was just as necessary for all the parties against whom the judgment was rendered to join in the writ of error, as it was at common law for two plaintiffs to join in an original action. Indeed, whenever writs of error are now used, the style is preserved, and the parties are termed *plaintiffs* in error. Unless, therefore, all the parties against whom there was judgment, joined in the writ, there was a variance between the writ of error and the judgment recited. Courts of common law have, however, exercised by way of motion in a summary way, certain equitable powers, controlling to some extent the legal powers of parties. Thus in the case of writs of error, they allowed one plaintiff in error to use the name of the other parties in obtaining the writ. See 2 *Wm's Saund.*, *note*, *p.* 101 *e*, and 101 *f*. It is a mistake into which some of the authorities have been led by general expressions, to suppose that the process of summons and severance was used to enable one joint party to obtain a writ of error without joining his co-party in the writ. Serj. Williams, who has treated this subject more fully than any other author, explains that one of several parties could obtain the writ, but he must do so in the *names of all*. When the case was by the writ brought into the appellate court, it then became necessary for the parties seeking redress to appear and assign errors. And as it was an original action, it was necessary for the parties to appear by attorney; and for that purpose it was necessary, in England, for the attorney to have a warrant authorizing him to appear. Now although one joint party could obtain the writ in the name of

all, yet he could not execute the warrant of attorney neces-sary to join his co-party in assigning errors. To obviate this difficulty, after having obtained the writ and brought the case into the appellate court, if his co-party refused to join in as-signing errors, he was allowed the writ of summons, com-manding such party either to come into court and join in the assignment of errors, or else to sever from him and allow him to proceed alone. A careful examination of the note above referred to, will show that this process of summons and sever-ance applied not to the issuing of the writ, but solely to the assignment of errors, and that the process originated not in the inferior, but in the appellate court, and therefore never was the foundation of the right of appeal, but only a subsequent stage of the proceeding. The difficulty thus felt in courts of law, was, however, never known to courts exercising equita-ble jurisdiction, for the simple reason that they are not con-trolled by the writ commencing the proceedings, or by the position of the parties, whether joint or several. So much is this the case, that one acknowledged source of equitable juris-diction arises out of the power of the court to control parties in the exercise of their legal rights, at the expense of the real rights of others; thus an equitable assignee may sue in equity, because of the refusal of the legal party to allow him to use his name at law. And one jointly interested, who refuses to be plaintiff, may be made defendant. The same latitude has been universally allowed in England, in appeals from the court of chancery. The appeal is not like the writ of error, to have the record sent up and critically examined, to see whether any form has been omitted or deviated from; it is rather in the nature of a bill of review, by which, on petition, the appellate tribunal looks at the proceedings, and sees whether substantial justice has been done—and this without regard to the position of the parties. It is true that they will not correct errors in the court below on behalf of parties not appealing; but *any party may appeal,* and *on his appeal* the whole case, so far as he is concerned, and so far as other par-ties are affected by his appeal are concerned, is brought before the appellate court, whether they be plaintiffs or defendants.

Thus Daniel, in his *Ch. Practice, (Perkin's Ed.,) Vol. 3,* page 1633, says: "*Any person* who feels himself aggrieved by a decree or order of the court of chancery, *is entitled, as a matter of right,* to appeal to the House of Lords." And Lord Chancellor Cottenham, in *Holmes vs. Henty, 4 Clark & Fin.,* 149, says: "It is said that it was not competent for one of the defendants below to appeal without the others. Such a rule as that, would lead to a denial of justice. There is no such rule of practice in appeals to this house." See, also, *Colvin vs. Hartwell, 5 Clark & Fin.,* 484, where an appeal by one of several plaintiffs in an equity case was sustained. *Stewart vs. McDonegal,* 13 *Irish Eq. Rep.,* 106, *Christ's Hospital vs. Grainger,* 1 *Macn. & Gor.,* 460. Numerous other cases might be cited, but the above are deemed sufficient. In none of these cases, nor indeed in any of the cases in England, of appeals in equity, is any thing said about a summons and severance. The only act required, is to petition for an appeal. In New York the same rule of practice prevails in regard to appeals in equity. In *Cuyler vs. Moreland,* 6 *Paige,* 274, it is said, that a party not aggrieved *should not join* in the appeal. And in *Reid vs. Vanderheyden,* 5 *Cowen,* 719, it was considered doubtful as to whether a party had a right to join in the appeal, because of a decree against him for costs. It is believed that, with a few exceptions, the doctrine of the English courts on this subject has been generally adopted in this country, and has always prevailed in this State. In the Supreme Court of the United States, however, a contrary doctrine has been adopted. The case of *Owings vs. Kincannon,* 7 *Pet.,* 399, which is the foundation upon which all the subsequent decisions of that court rest, depended upon the construction of an Act of Congress, and Chief Justice Marshall expressly states, that the court had not been referred to any precedents in chancery practice on the subject.

A case from 2 *J. J. Marshall,* 72, has been cited by the appellee, in which it was held, that one defendant in equity could not appeal alone. But this case is deprived of all weight by the manifest error into which the court fell in con-

founding writs of error with appeals in equity. The judge, in delivering the opinion, says, that one of several parties cannot appeal, and that if his co-defendant refuses to join in the appeal, the party desiring to appeal must *sue out a writ of error*, and then have a summons and severance. Now writs of error to the court of chancery, at least on its equitable side, are unknown. 3 *Bl. Com.*, 445. 2 *Daniel's Ch. Pr.*, 1222. Surely, cases which are founded upon such mistakes of the course of procedure and practice, are entitled to little authority. The other cases cited by the appellee are based upon a similar blunder.

. The principles and authorities above recited, lead to the conclusion that, upon general principles, the appeal in this case, by one of the defendants, ought to be sustained. But if we look to Maryland practice and legislation, the right to the appeal is still more clear. Unfortunately, the Acts of Assembly in this State have been very irregular and confused. Oftentimes the same Act of Assembly has been repeated almost *verbatim*, and then again certain Acts have been passed which assume the existence of previous Acts, of which no trace can be found. And our courts have repeatedly been compelled to acquiesce in the existence of laws, because of a previous general recognition, although there is no legal sanction to be found. In investigating the subject of appeals and writs of error, no one can fail to meet with this difficulty. How is it that in our courts of common law jurisdiction, we have appeals? That such is not the course of procedure in common law courts, has been already shown. Yet in Maryland we have appeals extensively in use in cases of common law jurisdiction. It is believed that the practice arose either out of the Act of 1713, ch. 4, or from an earlier statute, which it repealed. This Act, after providing for the mode of staying executions, &c., in its fourth section, declares how appeals and writs of errors shall be prosecuted, namely, by procuring a transcript of the record, and causing it to be transmitted to the appellate court. And the 5th section declares that any appeal made in the manner indicated, shall be admitted by the appellate court in the nature of a writ of

error. And that when the appeal is demanded, the clerk shall enter the application and make out the transcript of the record. The effect of this Act was to dispense with the necessity of any writ of error, and to obviate all difficulties growing out of the formalities required at common law; for the only thing necessary to be done, was for the party desiring an appeal to demand it, and then the clerk must make out the transcript, and the appellate court were directed to entertain the appeal. No writ of error was necessary after that. See *Thompson vs. McKim*, 6 *H. & J.*, 329. See, also, argument of counsel and opinion of the court in the case of *Isaac vs. Clark*, 9 *G. & J.*, 113. *Jenifer vs. The Lord Proprietary*, 1 *H. & McH.*, 535.

It should be remembered, that even according to the strict rules of the common law, one of several defendants could prosecute the writ of error, although in so doing he was compelled to use the names of the other parties. It was only in assigning errors that it became necessary for other parties to join, or, in case of a refusal, for a summons and severance to take place. See 2 *Wm. Saund.*, 101. Now the Act of Assembly of 1713, appears to have been intended, or, in fact, in practice, to have completely done away with the formal parts of the process in writs of error. The writ was dispensed with, and, in practice, the assigning of errors in form has been also dispensed with. Can there, then, be any necessity for the summons and severance? Surely not; for among all the cases reported in this State, such a proceeding never appears to have been taken—nay, not even to have been thought of—until the case of *Price vs. Thomas*, in 4 *Md. Rep.*, 514; and there the point was avoided by an amendment of the record.

But even if a summons and severance were necessary in it, in cases at common law, such a proceeding was never used in England in equity practice. There, as has been shown by the authorities already cited, no such process was known, and any party affected by a decree was at liberty to appeal. Upon what principle should we in Maryland, at this late day, go back to ancient English practice, and carry it beyond even

the extent to which it was then formerly carried? But a still greater difficulty occurs if we attempt to apply the practice suggested. According to the decision in *Thompson vs. Mc-Kim*, the demand for the appeal and the bringing up of the record constitute the only steps necessary to be taken. Suppose one of two defendants desires to appeal from a decree, what steps is he to take to enable him to do so without the assent of his co-defendant?—and let it be borne in mind that even in the strictest days of the common law, he had that right. It is said he must have a summons and severance. But how, and from what authority? Not from the inferior court, for apart from the fact that it is, of course, adverse to him, the summons and severance known to the common law tribunals must have issued from the appellate court, since it was a summons to the party to come into the appellate tribunal, and either assign errors or sever. But if the motion to dismiss in this case prevails, it must be upon the ground that the case has never properly reached the appellate court, otherwise a summons and severance might now take place. Thus, under a system devised to relieve appeals from difficulties growing out of matters of form, we would have parties aggrieved denied redress, on account of a mere want of form, more completely and effectually than by the older system. The defendant appealing in this case could not have a summons and severance in the court below, for such a process is unknown to either the courts of law or equity, either in England or in this State, and he is to be told that he cannot procure it in this court, since he is met here by the objection that until the appeal is taken by both parties, this court can have no jurisdiction over the case, and the appeal must be dismissed. To enable one defendant in this State to appeal without or against the consent of a co-defendant, some new process or writ must be invented, the form and nature of which it would be difficult to anticipate; and yet, even at law in England, as well as elsewhere, one defendant is entitled to an opportunity of being heard in the appellate court, against the wishes of a co-defendant. It is respectfully suggested, that should the motion to dismiss this appeal be sustained,

some such form of redress as is supposed to exist, should be indicated. But it is further respectfully suggested, that the legislation in Maryland is conclusive upon the right of one party to appeal, at least so far as equity cases are concerned. The Act of 1721, ch. 14, sec. 4, provided, "that it shall and may be lawful for any person or persons that shall conceive themselves aggrieved by any decree of the chancery court, to have an appeal," &c. It is true that the appeal then was to the governor and council; but although the appellate tribunal has been since changed, the right of appeal does not appear to have been intended to be abridged. Now, language could not be clearer or stronger. *Any person* has the right to appeal *who conceives himself aggrieved.* What does this mean but to say that you must hear any party who conceives himself aggrieved; and having heard, you are to give him redress if he is aggrieved improperly, as he complains. Certainly it cannot be construed to mean that you are to dismiss him without a hearing, because some other person who may also possibly have been aggrieved, does not join in the application. Similar language is repeated in the Act of 1814, ch. 94. Indeed, the language used on this subject by our Acts of Assembly, is almost identical with that quoted from *Daniel's Ch. Practice,* concerning the English doctrine, that *any party aggrieved* may of right appeal, except that Daniel confines it *to parties,* whereas our Acts refer *to persons,* a more general term; and, in fact, persons not technically parties to the suit, such as, for instance, purchasers under a decree to sell, have been allowed the right of appeal, without the concurrence of the real parties to the cause.

There remains to be considered the practice in this State. It does not appear that the *precise point* now under consideration has been presented to our Court of Appeals. But it does appear from many reported cases, which were strongly contested, that the right to appeal under such circumstances, has been repeatedly recognized and sustained, without objection. Among other cases, those of *Thompson vs. McKim,* before quoted, and *Strike vs. McDonald,* 2 *H. & G.,* 191, deserve especial attention. In both of these cases, the ques-

tion was as to the right of appeal; in both cases *one of several defendants alone appealed;* and the length of the reported arguments, as well as the distinguished character of the counsel engaged, show that every point deemed worthy of consideration was made; yet the objection now insisted on, that one defendant alone could not appeal without summons and severance, was not even made. In *Thompson vs. McKim,* the appeal of one defendant alone was sustained; and in the other case, that of *Strike vs. McDonald,* the appeal was refused on the express ground that Strike, one of the defendants, had not appealed from a previous decree in the cause. And this last case was, in its facts, similar to the one now before the court; it was an attempt by creditors to set aside a fraudulent conveyance made to Strike; the grantor was a party defendant, but took no part in the appeal, and no one seemed to consider it at all necessary that he should do so. Many other cases might be cited in which appeals, both at law and in equity, have been sustained at the instance of one of several parties. *Stevenson vs. Schriver,* 9 *G. & J.,* 324. *Parker vs. Gwynn,* 4 *Md. Rep.,* 423. *Moore vs. White,* 4 *H. & J.,* 548. *Ellicott vs. Ellicott,* 6 *G. & J.,* 35. *Maccubbin vs. Cromwell,* 2 *H. & G.,* 443. *Barnes vs. Dodge,* 7 *Gill,* 109. *Alexander vs. Worthington,* 5 *Md. Rep.,* 471. Some of these cases, it is true, were decisions upon special Acts of Assembly; but the language of the Acts thus construed is not more clear and explicit than those allowing appeals in equity cases generally. In the two cases last cited, the objection taken was not that one defendant could not appeal alone, for that seemed to be conceded; it was only argued that one defendant could not appeal from an injunction until the other defendants had answered; and that objection was overruled.

*Benj. C. Barroll,* for the motion:

I feel that I might safely rest the matter in issue upon the clear and learned opinion of this court, on file, dismissing the appeal in this case. But a brief argument in reply, may reasonably be expected of me, after the elaborate arguments filed by the two counsel on behalf of Lovejoy.

1. A great deal of labor and research has been expended to establish what is not and never has been denied, to wit: that from a decree in chancery, any party whose rights are affected by the decree, has the right of appeal, provided he be a party to the cause. This disposes of a very large portion of the arguments filed in favor of sustaining this appeal. But as it has nothing whatever to do with the question now to be decided, I pass it by without comment.

2. The attempt to foist into the argument of this motion the merits or demerits of the case, as made out on the evidence, is an abuse of the privilege accorded by this honorable court, to re-argue *the motion to dismiss the appeal,* and not to be followed.

3. Nor do I think it necessary to examine the very learned disquisition in relation to the origin of writs of error and appeals in England or in this country; these matters have little, if anything, to do with the question before the court.

4. The sole question now before the court for re-argument is, whether this honorable court have decided erroneously in laying down the principle, that one defendant cannot, without summons and severance, appeal from a decree in chancery against several defendants *jointly,* whose interests are united and affected by the decree?

The decree in this case was based upon the joint and equal fraud of the two defendants, Heath and Lovejoy; if either had been *innocent,* the decree could not have been obtained. The legal effect of the decree was to annul a fraudulent sale and purchase made between the two defendants; as a consequence, the court adjudged the chattels in the bill of sale to be the property of Heath, and liable to the execution of Irelan, and the legal liability of Heath to Lovejoy, to refund the $750 mentioned in the fraudulent bill of sale. Here, then, we see the most intimate union of interests of both defendants under this decree. Furthermore, it is a *joint* decree against both, as to the costs to be recovered by complainant, Irelan. This disposes of a large portion of the argument on the other side, where the attempt is to show that the interests

69 v. 17

were several and not joint, and, in fact, that Heath had no interest at all. The counsel arguing this motion forget that the whole machinery in relation to the bill of sale was a sham, a deceit, and a fraud, and that not a dollar passed between the parties. The court sees, upon the *pleadings*, that the interest of both these defendants is covered by the decree of the court, and that the decree, on its face, professes to affect them both jointly and equally. And, on the motion now under consideration, *the decree stands in full force*, with the rights of the parties under it adjudicated. Their *joint interests* in the bill of sale were the subject of that adjudication, and if the decree was erroneous, they were *jointly aggrieved*. To set aside and declare null and void a sale from one to another, necessarily affects both parties; it is true, in the present case, that Lovejoy may be the greater sufferer of the two, in being thus foiled of reaping the fruit of the act fraudently perpetrated. When the counsel prepared *Heath's answer*, he evidently thought that Heath had an interest in sustaining the bill of sale. The truth is, both Heath and Lovejoy had an interest in defeating the bill filed in this case beyond the mere value of the chattels conveyed, by reason of their joint relation to the *school* called the "Newton University." Heath's struggle in this case led him and his counsel to take an appeal from the mere interlocutory order authorizing the examination of Heath as a witness.

5. The counsel says, that because Heath was examined as a witness, a decree against him became *impossible*, and Lovejoy being the only person on record against whom a decree could be passed, he became entitled, *even if not so before*, under the common law rule, to prosecute a writ of error alone. Whether a decree against Heath *became impossible* or not, from the cause assigned, it is, nevertheless, an undoubted fact, that a decree against Heath was passed by the court!—and still stands in full force—consequently, the basis alleged as the right of Lovejoy to prosecute a writ of error *alone*, fails.

6. The rule requiring all parties in interest, under a judgment or decree, to unite in the appeal, is not a wanton and

arbitrary rule, but one founded on good common sense and right reason. It does not prevent *one* from getting his individual appeal, by the simple mode of summons and severance. But so long as the interests are united, it prohibits the anomaly of one party appealing from a judgment, which binds and affects several parties. If the principle were otherwise, the consequence might be, that in a decree against five defendants, there might be five distinct and separate appeals. The proposition is monstrous. In 4 *Md. Rep.*, the point was only not decided by the Court of Appeals, because it was conceded! The point "was avoided by an amendment," only because it was fatal. The counsel says, the case in 7 *Pet.*, 399, *Owings vs. Kincannon*, depended upon the construction of an Act of Congress. Not so. An Act of Congress, 1789, allowed cases to be removed to the Supreme Court by *writ of error*. The Act of 1803, gave the right of *appeal*, and declares "that such appeals shall be subject to the same rules, &c., as are prescribed by law in cases of writs of error," (*page* 401.) That case was in chancery, like the case here. So in Maryland, the Act of 1713 allowed appeals and writs of error in common law cases; and by the Act of 1721, "appeals from the court of chancery are directed to be prosecuted in the same manner as appeals from the courts of common law." See *Alex. Ch. Prac.*, 187. There was no question of *construction* involved in the decision in 7 *Peters;* the court merely referred to the Acts of Congress, which placed writs of error and appeals on the same footing; in Maryland they are placed on precisely the same footing. The case in 7 *Peters* was as much a proceeding *in rem.* as the case at bar. And although Judge Marshall says, that "we have found no precedent," &c., he evidently intends *no precedent in the Supreme Court*, in a chancery case; yet he declares, *that upon principle*, there is no difference between a case at common law and a case in chancery, and he cites 11 *Wheaton*, 144. *Tidd's Practice*, cited in argument by the counsel, is directly adverse to his side of this question. The cases he cites from 1 *Levinz*, 210, and *Hobart*, 70, are not in point; there the judgments were several and not *joint*—a judgment

by default as to one defendant, and a judgment on verdict as to another defendant in the same cause, *are two judgments*, and have no connection, the one with the other.

There is great effort made to prove that the interest of Heath and Lovejoy, under this decree, was not what the counsel calls "a unity of interest," and in another place uses as an equivalent, the term "a common interest." Now the true mode of testing this question is very simple; it seems to me it is this:—Does the decree, vacating the bill of sale, operate upon and affect both parties? Could a decree, vacating this bill of sale, have been passed so as to affect one party and not the other? Certainly not! Suppose Lovejoy could succeed in reversing this decree, what will be the consequence? The decree annulling the bill of sale as fraudulent stands in full force, so far as the grantor (Heath) is concerned. How can it stand annulled and fraudulent as to the one and not as to the other? It must, *in law*, be good and valid, or null and void.

The counsel thinks that the application of Heath for the benefit of the insolvent laws, severed the interests of these parties. The question is, upon the right to appeal from the decree in this case. And how Heath's application for the benefit of the insolvent laws, can affect that question, I am at a loss to conceive. It did not make the bill of sale less fraudulent and void. It did not remove the grasp of Irelan's execution upon the property. It did not injure Lovejoy, as Heath owed him nothing. The only conceivable effect was, that when the bill of sale should be declared null and void, the trustee of Heath would be entitled to take possession of and sell the property, *if he could find it!* The counsel asserts, and assumes as a matter not to be questioned, that the judge below would not have passed a decree against *Heath*, if he had any real interest in the subject matter. I reply, it was because Heath had a real (legal) interest in the subject matter, that the judge was compelled to pass a decree against him. Again, the judge was compelled to pass a decree against Heath, *or dismiss the bill!* as he could not pass a decree against one and not the other, or rather to affect one and not

Lovejoy vs. Irelan.

the other. One might be more injured by the decree than the other, but the *fraud* which rendered the bill of sale a nullity, being the joint act of both, rendered a decree affecting both indispensable, and punative as to the costs.

The counsel thinks that Lovejoy is deprived of all redress, if this motion prevails. Redress for what? The record shows that a court of competent jurisdiction has decided and declared him *guilty* of perpetrating a *fraud* upon the complainant in this case, and for five years he has successfully prevented this complainant from receiving one dollar of his debt. And one of his chief complaints seems to be, that his partner in the *fraud* did not stick by him to the end.

In 4 *Md. Rep.*, Judge Mason, delivering the opinion of this court, decided virtually the question involved in this motion. In 5 *Md. Rep.*, 477, the court again decided it, but held that it did not apply to that case, because the Act of 1835, ch. 380, in relation to injunctions, varied the rule. The same principle is decided by the Supreme Court, in 16 *Peters*, 521; and the principle is decided and clearly stated in the case cited on the original argument, in 3 *How.*, (*Miss. Rep.,*) 43, and in all the other cases then cited.

LE GRAND, C. J., delivered the opinion of this court.

*Per Curiam.*—The court have carefully considered the arguments addressed to them in this case, on the re-hearing of it, and see no reason to disturb their order, as passed on the original argument, to which they adhere. Costs of re-hearing to follow original decree.

(Decided Oct. 29th, 1861.)